# IN THE COURT OF APPEALS OF IOWA

No. 18-1931
Filed January 9, 2020

IN RE THE MARRIAGE OF LYNNE B. BARNHOUSE
AND JOEL P. BARNHOUSE

Upon the Petition of
**LYNNE B. BARNHOUSE,**
        Petitioner-Appellee,

**And Concerning**
**JOEL P. BARNHOUSE,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Dallas County, Thomas P. Murphy,

Judge.


        Joel Barnhouse appeals from the decree dissolving his marriage to Lynne

Barnhouse. **AFFIRMED AS MODIFIED.**


        James V. McKinney of McKinney Law Offices, P.C., Waukee, for appellant.

        Jason S. Rieper of Rieper Law, P.C., Des Moines, for appellee.


        Heard by Bower, C.J., and May and Greer, JJ.

**GREER, Judge.**

Joel Barnhouse appeals from the decree dissolving his marriage to Lynne Barnhouse. He argues the court should have set aside his gifted and premarital property before dividing the remaining property between the parties. We find that some of the realty should be excluded from marital property, and we modify the equalization payments to Lynne. We otherwise affirm the district court. We also deny Lynne's request for appellate attorney fees.

## I. Background Facts and Proceedings

Joel and Lynne began dating around October 1997. In May 1998, they began commingling funds in a single bank account. They moved in together by late 1998 with their children from prior relationships. As a couple, they produced no offspring. When the relationship crumbled, Lynne petitioned for dissolution of marriage on December 2, 2016. Because Joel disputed the marital status of the couple, the district court found by separate order that they entered into a common law marriage on or about January 1, 1999.[1] The dissolution matter went to trial on June 14, 2018.

By way of background, Joel was born in 1951. At the time of trial, he worked for a small company in Des Moines performing maintenance and repairs. He reported receiving gross annual employment income of $55,866 and gross annual Social Security benefits of $25,920. He plans to retire around the end of 2018. Upon retirement, he will receive $3408 annually from a pension with a former employer.

---

[1] In this appeal, Joel concedes the marital status as of January 1999.

As for Lynne, she was born in 1961. At the time of trial, she worked for a company managing livestock. She reported receiving gross employment income of $31,607.37 for 2017. She has no significant retirement savings.[2]

The marital property mainly consists of five pieces of realty. The parties agreed to the value of each parcel. We summarize each real estate holding.

1. Dexter Acreage[3]

The Dexter acreage is a three-acre parcel worth $42,700 and is unencumbered by debt. Joel bought this property from his mother around 1979. In 2012, the parties spent about $20,000 from the Guthrie farm mortgage funds to construct a small building on the property and also used funds to pay off a loan against the acreage.

2. Adair Farm

The Adair farm is a 152-acre parcel worth $1,228,160. Joel and his brother, Tim, each own a one-half interest in the Adair farm, making Joel's interest worth $614,080. Minus taxes and insurance, the total net annual cash rent from the property is $13,514. So Joel's share of the annual net cash rent is $6757. At the time of trial, the couple's remaining debt obligation from the amount borrowed to purchase the property equaled $71,798.[4]

---

[2] Lynne testified she has a 401(k) retirement savings account, but it has no equity because she borrowed the entire amount to pay for this proceeding.

[3] The trial court referenced this property as Adair County Acreage, but the parties use Dexter Acreage in their briefs so we use their terminology.

[4] The record contains conflicting statements with minor differences in the current amount of the Adair farm debt. The trial court valued Joel's share of the Adair farm debt at $71,798, as do we.

Joel's grandfather owned the Adair farm during his lifetime. He left the property to a family trust when he died. Beneficiaries of this trust included Joel and his three siblings in equal shares. No one disputes that Joel inherited a one-fourth interest in this farm. In 2005, the entire property went to auction after two of the siblings forced a sale. Joel and Lynne bought the property at the auction with Joel's brother, Tim, for $408,200. Tim and Joel paid their siblings one-half of that price for their shares, and at the same time they borrowed $475,000 from the bank. Joel owned the property with his brother, but later Lynne signed a deed so the brothers owned the land as tenants in common.

3. Guthrie Farm

The Guthrie farm is a 110-acre parcel worth $759,760. The net annual cash rent from the property is $16,961. At the time of trial, there was a mortgage obligation with a balance of $222,762.[5]

Joel testified the property has been in his family since around the Civil War. In 1966, Joel's father deeded the property to his siblings—Joel's uncle Tom and aunt Edith. On June 26, 1998, Tom and Edith deeded the property to Joel. Joel mortgaged the property and paid Tom and Edith $30,000 for the Guthrie farm in 1998 with a promissory note only Joel signed; however, the parties agree the property was worth $160,600 at the time. Joel testified the property was a gift from his uncle and aunt. While Lynne agreed with characterizing the property as a gift, she also testified they bought the property under a "stipulation with the family that

---

[5] The parties borrowed $250,000 against the Guthrie farm on October 9, 2012. The parties used the funds for several purposes, including paying debts secured by the Redfield home, the Adair farm, and the Dexter acreage, and for reconstruction of the Redfield home.

we would take care of Tom and [Edith]." The parties disagreed about the date Edith began living with them—Joel testified it was after the purchase and Lynne maintained it was before purchase. For the next three years, Lynne provided round-the-clock care for Edith, received $900 per month in public assistance as a caretaker wage for that role, and did not work outside the home. Edith eventually moved into a nursing facility when her needs became too great for Lynne. Later, from about November 2002 until January 2003, Joel's father lived with the parties and Lynne provided "light care" to him while she worked outside the home.

4. Redfield Home

The Redfield home is worth $190,000 and has no debt. Lynne acquired the property during a previous marriage and received sole ownership of the property in the prior divorce settlement.[6] Joel moved into the Redfield home with Lynne and their then-minor children in late 1997. In 2005, the home suffered extensive fire damage, which the parties repaired largely using insurance money. In 2011, another fire destroyed the home. The parties then demolished the remains and built a new home in its place. Each party confirmed they used funds from the Guthrie farm mortgage to pay $60,277 to rebuild the Redfield home and $51,005 to satisfy the original Redfield home loan.

5. Spirit Lake Home

The Spirit Lake home is worth $418,000 and has no debt. Lynne's parents owned the property for about fifty years before they deeded the property to her on July 15, 2011. The parties paid $50,000 for the property, which Lynne

---

[6] The record contains no details about the premarital value of the Redfield home.

acknowledges was well below market value. Joel helped with maintenance and repairs to the property while Lynne's parents owned it, and he continued to do so after the transfer.

Once trial began, Lynne and Joel agreed on the specific award of real estate. The dispute involved designating what was marital property and the resulting equalization payment. Lynne requested an equalization payment of $300,000, plus spousal support or an additional property payment of $125,000 in lieu of ongoing support. Joel characterized much of the property as non-marital and requested a $132,828 payment to him for an equitable division.

On August 31, 2018, the district court issued the dissolution decree. The court awarded each party their requested realty and included the entire value of each property and debt in the marital estate. The court awarded the Dexter acreage, Adair farm, Guthrie farm, and respective debts to Joel; it awarded the Redfield home and Spirit Lake home to Lynne. The court ordered Joel to make an equalization payment to Lynne of $256,990 to account for the difference in their property awards. The court also awarded an additional property payment of $60,000 to Lynne in lieu of support.

Joel now appeals the property distribution. Lynne asks us to affirm the district court and to award her appellate attorney fees.

## II. Standard of Review

"Marriage dissolution proceedings are equitable proceedings." *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016) (citing Iowa Code § 598.3 (2016)). "Thus, the standard of review is de novo." *Id.*; *see also* Iowa R. App. P. 6.907. "Although we give weight to the factual findings of the district court, we are

not bound by them." *Mauer*, 874 N.W.2d at 106; *see also* Iowa R. App. P. 6.904(3)(g). "But we will disturb a district court determination only when there has been a failure to do equity." *Mauer*, 874 N.W.2d at 106.

### III. Property Division

The fighting issue involves the division and classification of the real estate. The district court refused to set aside any of the parties' five parcels of realty from the marital estate and included the full value of each parcel in the property division. Joel attacks the entire property division, setting forth arguments why each parcel and debt should or should not be marital property.[7] He objects to the payments required by the court.

In a dissolution proceeding, the court must "divide all property, except inherited property or gifts received or expected by one party, equitably" after considering various factors. Iowa Code § 598.21(5). One of these factors is "[t]he property brought to the marriage by each party." *Id.* § 598.21(5)(b). "The district court may assign varying weight to premarital property, but should not automatically award it to the spouse who owned the property prior to the marriage." *In re Marriage of McDermott*, 827 N.W.2d 671, 678 (Iowa 2013). "Property brought into the marriage by a party is merely a factor to consider by the court, together with all other factors, in exercising its role as an architect of an equitable distribution of property at the end of the marriage." *Id.* (quoting *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006)). "An equitable distribution of marital property,

---

[7] Because Lynne accepted the district court division and characterization of the assets, we detail her trial themes.

based upon the factors in 598.21(5), does not require an equal division of assets." *In re Marriage of Kimbro*, 826 N.W.2d 696, 703 (Iowa 2013).

Inherited and gifted property, whether received before or during marriage, "is the property of that party and is not subject to a property division . . . except upon a finding that refusal to divide the property is inequitable." Iowa Code § 598.21(6). "This subsection does not demand that property acquired by gift or inheritance must always be set aside to the donee and omitted altogether from consideration in the division of property. To avoid injustice property inherited by or given to one party may be divided." *In re Marriage of Muelhaupt*, 439 N.W.2d 656, 659 (Iowa 1989). In considering a division of an inheritance or gift, we consider these factors:

> (1) contributions of the parties toward the property, its care, preservation or improvement[];
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4) any special needs of either party;
> (5) any other matter[,] which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*McDermott*, 827 N.W.2d at 679 (quoting *In re Marriage of Goodwin*, 606 N.W.2d 315, 319 (Iowa 2000)).

The district court's heavy task involved establishing an equitable division with the characterization of each piece of land in mind. To make matters easier, the parties agreed on who should own each parcel and stipulated to the value of each property. The district court accepted their assignments of property and

stipulations of value, and we do as well. We are left with another step, though. We address the proper equalization award after determining the classification of the realty and its proper inclusion in the calculation. We review each parcel separately.

A. Spirit Lake Home

Lynne included all of the real estate, along with the Spirit Lake home, in the marital estate.[8] We agree with her characterization of this home. While purchased from Lynne's parents at a discounted value in 2011 with marital funds[9] and deeded only to Lynne, Joel provided "sweat equity" at the property. He helped with repairs and maintenance both before the purchase from Lynne's parents and after the purchase. Likewise, evidence of the donors' intent[10] and the circumstances surrounding the gift mitigates toward the classification of the property as marital. *See McDermott*, 827 N.W.2d at 680 ("[T]he evidence suggests the value of this generosity was intended to inure to the family, not to [the husband] alone."). The property is debt free, and these parties satisfied the mortgage obligation during the marriage. The donor's intent and the circumstances surrounding the inheritance or gift are the controlling factors used to determine whether inherited or gifted property is subject to division as marital property. *In re Marriage of Liebich,* 547

---

[8] Joel asserted the Spirit Lake home was marital property subject to division while other parcels were premarital and gifted property that should be set aside to him. We note Lynne included all five parcels in the marital estate, though she could have similarly argued certain parcels were premarital and gifted property that should be set aside to her.

[9] We found no evidence of the property value at the time of the purchase in 2011.

[10] Lynne testified her parents' intention was the property was both her's and Joel's: "[T]hey expected us to be together forever, and they expected both of our children . . . to be a part of the next generation to take it on."

N.W.2d 844, 850 (Iowa Ct. App. 1996). Given Lynne's testimony and the contributions Joel made toward the care of the property, it should be treated as marital property.

### B. Dexter Acreage

No one disputed Joel's premarital ownership of the Dexter acreage extending back to 1979. The land originated with Joel's maternal family. Yet in 2012, the parties used marital funds to construct a building improvement and pay off an acreage debt of $53,342.09. Even so, Joel retains that debt against the Guthrie farm that funded this construction and payoff. To achieve equity, we agree that the property should be a part of the marital estate given Lynne's contribution to its value.

### C. Adair Farm

Joel inherited a one-quarter interest in this farmland along with his siblings. At trial, both parties testified that Joel received a one-quarter interest as an inheritance.[11] Relations between the siblings soured, and the property was sold in a partition sale, from which Joel essentially acquired an additional one-quarter interest. Even though Lynne was not on the deed to this property, she was involved in the purchase from the partition sale, was on the mortgage related to the sale, and benefitted from the ultimate equity position in the farm real estate. Joel's inherited one-quarter interest in the property should be set aside as inherited property since Lynne provides no convincing rationale to do otherwise. On the

---

[11] Lynne's trial brief asserts that two-thirds of the remaining value of the farm after subtracting Joel and Tim's inherited shares should be part of the marital estate to be divided.

other hand, equity supports that the net value of Joel's additional one-quarter interest be part of the marital estate.

D. Redfield Home

Lynne owned the Redfield home before the marriage, having received it in a previous divorce as her sole property.[12]  Requesting that all property be placed in the marital pot, Lynne asserted—and the district court agreed—the current full value of the real estate should be included in the division.  Because the parties fully rebuilt the Redfield home following two fires using marital monies and insurance proceeds, it is just to include the full value in the equitable division formula.  All in all, Joel bears the continued burden of the loan that paid various debt obligations on this home.  Thus, equity requires including the property value as a marital asset.

E. Guthrie Farm

The Guthrie farm falls under the classification of both a gift and a premarital holding.  We reject Lynne's argument that the parties purchased the Guthrie farm during the marriage.  The deed from Joel's aunt and uncle transferred sole ownership of this farm to Joel in June 1998.[13]  That transfer occurred prior to the common law marriage, which the district court found began "on or about January 1999."  Unlike the *McDermott* case where the property at issue was deeded to both spouses, no one deeded this farm to Lynne.  *See* 827 N.W.2d at 682.  The family

---

[12] The record contains no information related to the home value or debt history at the time of marriage.

[13] Joel's paternal uncle and aunt never married or had children.  Both Joel and his brother, Tim, testified to a verbal promise by the uncle and aunt to "deed" it back to an heir when they passed.  Joel paid them $30,000 for a farm valued at $160,600 in 1998.  He also paid his father $20,000 for past rent due.

effort to protect the aunt and uncle began in 1966, long before the marriage, when Joel's father deeded his interest in the farm to his brother and sister to assure them a home. Lynne persuaded the district court to classify the full value of the farm as a marital asset because the discounted transfer of land arose from the couple's agreement to care for Joel's aunt. Joel maintains the family plan related to his payout for the farm occurred after the farm transfer and so the caretaker proposition was not a factor in the price paid. We note Lynne cared for the aunt for three years and benefited from a caretaker wage. Yet the district court, with the advantage of first-hand observation of the witnesses, accepted Lynne's testimony as more credible on this issue. Thus, we decline to change the finding that care of the aunt impacted the discounted price. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) ("A trial court deciding dissolution cases is greatly helped in making a wise decision about the parties by listening to them and watching them in person. In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented." (internal citations and quotations omitted)).

Even with a care agreement, we find equity rests by setting aside 40% of the net farm value as a gift to Joel and considering 60% of the net value as marital property resulting from the parties' joint efforts in this long-term marriage. Lynne benefited from Joel's inheritance of family farmland as the equity in that land provided the opportunity to leave the marriage with unencumbered real estate. While Lynne made contributions to enhance the inherited real estate, the record is void of any close relationships between Lynne and the donors. *See In re Marriage*

*of Thomas,* 319 N.W.2d 209, 210–12 (Iowa 1982) (finding the wife's role in improving the property mitigated toward dividing the property, but concluding her lack of relationship with the donors made distribution to the husband equitable).

### IV. $60,000 Property Award.

In his brief, Joel argues that the $60,000 property settlement in lieu of alimony award might be appropriate with a different distribution of the assets. The district court opined that the award allowed Lynne to maintain her married lifestyle "over the next year or so." The district court carefully characterized the payment a property award in lieu of support. By awarding the farms and their rental income to Joel, we note that Joel's annual income before retirement is $105,504,[14] which will decrease to $53,046[15] upon his planned impending retirement. Lynne's 2016 income was $31,607.37, and she has no significant source of retirement income other than Social Security and her 401(k) account with no equity.

At trial, Joel argued against the additional property award to Lynne. Yet, in his brief, Joel minimally addresses the issue and cites no authority for his argument. "Failure to cite authority in support of an issue may be deemed waiver of that issue." Iowa R. Civ. P. 6.903(2)(g)(3). We consider the matter as part of the overall property settlement provided by the district court in determining whether a support award is warranted under these facts. *See In re Marriage of Dean,* 642 N.W.2d 321, 325 (Iowa Ct. App. 2002). We look at the decree as a whole in

---

[14] Joel's $105,504 annual pre-retirement income comprises $55,866 in 2016 wages, $25,920 from Social Security, $6757 in net rent from the Adair farm, and $16,961 in net rent from the Guthrie farm.

[15] Joel's $53,046 annual retirement income comprises $3408 from a pension, $25,920 from Social Security, $6757 in net rent on the Adair farm, and $16,961 in net rent on the Guthrie farm.

determining what is equitable. *Id.* None of the properties awarded to Lynne are income producing. Thus, we affirm the $60,000 payment as we cannot find this award is inequitable under these facts.

### V. Appellate Attorney Fees.

Lynne requests appellate attorney fees. Appellate attorney fees are within the discretion of the appellate court. *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996). "In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *In re Marriage of Hoffman*, 891 N.W.2d 849, 852 (Iowa Ct. App. 2016) (quoting *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997)). While neither party was entirely successful on appeal, we modify the dissolution decree in Joel's favor. Additionally, Lynne's award provides sufficient monies to pay her attorney. After considering all factors, an award of appellate attorney fees to Lynne is not warranted.

### VI. Disposition

In summary, we affirm the property award of the Dexter acreage, Adair farm, and Guthrie farm to Joel, and we affirm awarding the Redfield home and Spirit Lake home to Lynne. We find that these properties comprise the marital estate:

Spirit Lake Home:      $418,000
Dexter Acreage:        $ 42,700
Adair Farm:            $271,141 (25% net interest)[16]
Redfield Home:         $190,000

---

[16] Joel's one-half net value of the Adair farm interest with his brother equals $614,080 minus debt of $71,798, totaling $569,282. Half of this value, $271,141, is the marital share of the Adair farm. The remaining value, $271,141, is Joel's inherited interest and excluded from the marital estate.

Guthrie Farm:             $322,199 (60% of net value)[17]
_____

Total marital estate:     $1,244,040

We modify the decree based on the following equitable division of the net marital property with Joel retaining the real estate debt:

| Lynne: | | Joel: | |
|---|---|---|---|
| Redfield | $190,000 | Adair Farm | $271,141 |
| Spirit Lake | $418,000 | Guthrie Farm | $322,199 |
| | | Dexter Acreage | $ 42,700 |
| | _____ | | _____ |
| | $ 608,000 | | $ 636,040 |

Joel shall pay Lynne a property equalization payment of $14,020 and the additional subsidy of $60,000 as ordered by the district court within thirty days after procedendo issues. We do not award appellate attorney fees.

**AFFIRMED AS MODIFIED.**

---

[17] The net value of the Guthrie farm is $759,760 minus debt of $222,762, equaling $536,998. 60% of this value, $322,199, is the marital share of the Guthrie Farm. The remaining value, $214,799, is excluded from the marital estate.